UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

ANDREWPHILLIP E.,[1]

Plaintiff,

v.

LELAND DUDEK, Acting Commissioner of Social Security,[2]

Defendant.

Case No.:  24cv108-LR

**ORDER REGARDING JOINT MOTION FOR JUDICIAL REVIEW**

**[ECF No. 15]**

On January 16, 2024, Andrewphillip E. ("Plaintiff") filed a Complaint pursuant to 42 U.S.C. § 405(g) seeking judicial review of a decision by the Commissioner of Social Security ("Defendant") denying Plaintiff's application for social security disability benefits and supplemental security income benefits.  (ECF No. 1.)  Now pending before

---

[1] In the interest of privacy, this order uses only the first name and initial of the last name of the non-government party or parties in this case.  See S.D. Cal. Civ. R. 7.1(e)(6)(b).

[2] Plaintiff named Martin O'Malley, who was the Commissioner of Social Security when Plaintiff filed his Complaint on January 16, 2024, as a Defendant in this action.  (See ECF No. 1 at 1.)  Leland Dudek is now the Acting Commissioner of the Social Security Administration, and he is automatically substituted as a party pursuant to Federal Rule of Civil Procedure 25(d).

the Court is the parties' "Joint Motion for Judicial Review" seeking judicial review. (ECF No. 15 ("J. Mot.").)  For the reasons discussed below, the final decision of the Commissioner is **AFFIRMED**.

## I.     PROCEDURAL BACKGROUND

On December 11, 2020, Plaintiff filed an application for a period of disability and disability insurance benefits, alleging disability beginning on July 1, 2017.[3]  (ECF No. 1 at 2.)  After his application was denied initially and on reconsideration, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  (ECF No. 9 ("AR")[4] at 172.)  An administrative hearing was held on September 27, 2022.  (See id. at 22–51.) Plaintiff appeared at the hearing with counsel, and testimony was taken from him and a vocational expert ("VE").

On November 29, 2022, the ALJ issued a written decision finding that Plaintiff had not been under a disability, as defined in the Social Security Act, from July 1, 2017, through the date of the decision.  (Id. at 146–47.)  The ALJ's decision became the final decision of the Commissioner on November 29, 2023, when the appeals council denied Plaintiff's request for review.  (Id. at 7–9.)  This timely civil action followed.  (See ECF No. 1.)

/ / /

/ / /

/ / /

---

[3] Plaintiff originally reported his onset date as July 1, 2017, but attempted to amend the onset date to March 3, 2019 at the administrative hearing.  (ECF No. 1 at 2; ECF No. 9 at 129–30.)  The ALJ used Plaintiff's alleged original July 1, 2017 onset date in his formal findings, while also referencing the amended March 3, 2019 onset date in his explanation of these findings.  (See ECF No. 9 at 129–30.) Because the ALJ made formal factual findings based on the July 1, 2017 date, the Court accepts this as the onset date for purposes of this Order.

[4] "AR" refers to the Administrative Record filed on March 18, 2024.  (ECF No. 9.)  The Court's citations to the AR in this Order are to the pages listed on the original document rather than the page numbers designated by the Court's Case Management/Electronic Case Filing System ("CM/ECF").  For all other documents, the Court's citations are to the page numbers affixed by CM/ECF.

## II.    SUMMARY OF THE ALJ'S FINDINGS

The ALJ followed the Commissioner's five-step sequential evaluation process. See 20 C.F.R. §§ 404.1520, 416.920.[5]  At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the alleged onset date, July 1, 2017.  (See AR at 132.)  At step two, the ALJ found that Plaintiff had the following severe impairments: bipolar disorder, anxiety disorder, and post traumatic stress disorder ("PTSD").  (Id. at 133.)  At step three, the ALJ found that Plaintiff does not have an impairment or combination of impairments that meet or medically equal the severity of one of the impairments listed in the Commissioner's Listing of Impairments.  (Id.)  The ALJ determined that Plaintiff has the residual functional capacity ("RFC") to:

> perform a full range of work at all exertional levels but with the following nonexertional limitations: Capable of persisting in job duties that require 1 to 3 months of on-the-job training; only occasional interaction with public; the individual can work in proximity to others, but there is no indication the individual can work in teamwork with others.

(Id. at 135.)

At step four, the ALJ determined that Plaintiff has no relevant past work.  (See id. at 145.)  At step five, based off the VE's testimony, the ALJ determined that a hypothetical person with Plaintiff's vocational profile and RFC could perform the requirements of occupations that existed in significant numbers in the national economy. (See id. at 146.)  The ALJ then found that Plaintiff was not disabled from July 1, 2017, through the date of the ALJ's decision.  (Id.)

## III.    DISPUTED ISSUES

As reflected in the parties' Joint Motion, Plaintiff is raising the following issues as grounds for reversal and remand: (1) whether the ALJ properly considered the opinions

---

[5] The disability insurance benefits (DIB) and supplemental security income (SSI) regulations relevant to this case are virtually identical; therefore, only the DIB regulations will be cited in the remainder of this order.  Parallel SSI regulations are found in 20 C.F.R. §§ 416.900–416.999 and correspond with the last digits of the DIB cite (e.g., 20 C.F.R. § 404.1520 corresponds with 20 C.F.R. § 416.920).

of Jennifer Liu, MD; and (2) whether the ALJ presented an accurate and complete medical-vocational profile to the vocational witness.  (J. Mot. at 4.)

## IV.    STANDARD OF REVIEW

Section 405(g) of the Social Security Act allows unsuccessful applicants to seek judicial review of the Commissioner's final decision.  42 U.S.C. § 405(g).  The scope of judicial review is limited, and the denial of benefits will not be disturbed if it is supported by substantial evidence in the record and contains no legal error.  See id.; Buck v. Berryhill, 869F.3d 1040, 1048 (9th Cir. 2017).  "Substantial evidence means more than a mere scintilla, but less than a preponderance.  It means such relevant evidence as a reasonable mind might accept s adequate to support a conclusion." Revels v. Berryhill, 874 F.3d 648, 654 (9th Cir. 2017) (quoting Desrosiers v. Sec'y Health & Hum. Servs., 846 F.2d 573, 576 (9th Cir. 1988)).  In determining whether the Commissioner's decision is supported by substantial evidence, a reviewing court "must assess the entire record, weighing the evidence both supporting and detracting from the agency's conclusion," and "may not reweigh the evidence or substitute [its] judgment for that of the ALJ." Ahearn v. Saul, 988 F.3d 1111, 1115 (9th Cir. 2021).  Where the evidence can be interpreted in more than one way, the court must uphold the ALJ's decision.  Id. at 1115–16; Atmore v. Colvin, 827 F.3d 872, 875 (9th Cir. 2016).  The court may consider "only the reasons provided by the ALJ in the disability determination and may not affirm the ALJ on a ground upon which [he or she] did not rely." Revels, 874 F.3d at 654 (internal quotation omitted).

## V.    RELEVANT MEDICAL BACKGROUND AND TESTIMONY

### A.    Mental Health Treatment

#### 1.    Naval service and discharge

Plaintiff reports that "the onset of his symptoms of depression and anxiety coincided with his participating in basic training in the Navy in 2016, at age 21."  (AR at 1531–32.)  Plaintiff was hospitalized twice during basic training, in June of 2016, due to psychiatric concerns.  (See id. at 1509, 1532).  Plaintiff received a medical discharge

4

from the Navy the same month and continued to receive care from the Veteran's Administration ("VA") for his psychiatric conditions.  (See id. at 508, 1474.)  Plaintiff reported severe depression "for three months after being discharged," followed by a slight recovery from 2017–2019.  (Id. at 1434.)  Plaintiff was prescribed several mood stabilizers during this period, which Plaintiff's medical provider subsequently described as conveying "no benefit."  (Id. at 1435.)

### 2. March 5, 2019 hospitalization

Plaintiff was admitted "on a hold" to Aurora Vista del Mar Hospital on March 5, 2019, after contacting emergency services and stating that he was suicidal.[6]  (Id. at 137; 454.)  Plaintiff reported he had a plan to stab himself in the chest or jump off a balcony.  (Id. at 455.)  A. Godwin, MD, a psychiatrist, performed Plaintiff's initial evaluation and noted that Plaintiff had "[d]epressive [s]ymptomology" and "[p]oor coping skills," but Plaintiff's memory and abstract reasoning were not impaired.  (Id. at 456.)  According to Dr. Godwin's notes, Plaintiff had an "inability to maintain safety of self/others" and needed treatment.  (Id.)

Dr. Godwin placed Plaintiff on a treatment plan, which included individual and group therapy, and adjusted Plaintiff's medications.  (Id.)  Dr. Godwin diagnosed Plaintiff with "[m]ajor depressive disorder, recurrent severe without psychotic features." (Id. at 462.)  Aurora Vista del Mar discharged Plaintiff on March 7, 2019, following a positive response to interventions, including group therapy and medications, to treat

---

[6] The ALJ refers to Plaintiff's hold on March 5, 2019, as a "5150 hold," appearing to reference California state law governing the use of involuntary psychiatric holds.  (See AR at 137); Cal. Welf. & Inst. Code § 5150 (West 2023) ("When a person, as a result of a mental health disorder, is a danger to others, or to themselves, or gravely disabled, a peace officer . . . may, upon probable cause, take, or cause to be taken, the person into custody for a period of up to 72 hours for assessment, evaluation, and crisis intervention. . . .").  However, evidence of the authority under which Plaintiff was admitted to Aurora Vista del Mar Hospital is not present in the record.  Plaintiff asserts this hospitalization was voluntary.  (See AR at 1275.)

anxiety and depression.  (<u>See</u> <u>id.</u> at 463–63.)  Dr. Godwin reported Plaintiff's suicidal ideation resolved and noted "no limitations" and "able to return to work."  (<u>Id.</u> at 463.)

### 3.    Initial outpatient treatment in San Diego

Li Liang, M.D., a psychiatrist, treated Plaintiff at Clear Insight Psychiatry in San Diego, California, from November 2017 to June 2019.  (<u>See</u> <u>id.</u> at 271.)  Dr. Liang provided treatment, including thirty-six sessions of transcranial magnetic stimulation ("TMS")[7] and a medication management plan.  (<u>See</u> <u>id.</u> at 432–33.)  In a remote session with Dr. Liang on June 26, 2018, Plaintiff noted that "[m]y thoughts are clear . . . and [my] mood is much better," after restarting Latuda[8] a few weeks prior.  (<u>Id.</u> at 424.)

Following his completion of TMS treatment on August 12, 2019, Plaintiff noted "[m]y energy level is better, my sense more aware, but I still have some depression and anxiety."  (<u>Id.</u> at 432.)  On September 6, 2019, Plaintiff stated in a remote session "I feel my depression coming back, I feel more anxious now."  (<u>Id.</u> at 436.)  Dr. Liang advised Plaintiff to resume TMS maintenance treatment, but Plaintiff declined.  (<u>See</u> <u>id.</u> at 1063.)  Plaintiff also stated that he doubted he would be able to start his job in two weeks during this September 6, 2019 session.  (<u>Id.</u>)  In a video visit on December 30, 2019, Plaintiff stated he had suicidal thoughts that "come and [go]," but stated he did not need to be hospitalized.  (<u>Id.</u> at 439.)  Plaintiff stated that TMS "worked for [two] months then it also stopped working."  (<u>Id.</u>)

---

[7] TMS is a noninvasive procedure that uses magnetic fields to stimulate nerve cells in the brain to treat symptoms of depression.  <u>See</u> <u>Talbert v. Comm'r of Soc. Sec.</u>, Case No. 18-cv-05218-SI, 2020 WL 1139585, at *2 n.6 (N.D. Cal. Mar. 9, 2020); <u>Gill v. Unum Life Ins. Co. of Am.</u>, Case No. 19-cv-04066-EMC, 2020 WL 6868832, at *3 n.2 (N.D. Cal. Nov. 23, 2020).

[8] Latuda is a brand name of the drug Lurasidone and is used to treat mood disorders, including schizophrenia or bipolar disorder related depression.  <u>See</u> <u>Perla A. v. Saul</u>, Case No.: 19cv1802-RBB, 2020 WL 5229384, at *2 (S.D. Cal. Sept. 1, 2020); <u>Nathan K. v. Saul</u>, Case No. CV 18-3518-JPR, 2019 WL 4736974, at *6 n.12 (C.D. Cal. Sept. 27, 2019); <u>Olmedo v. Colvin</u>, No. 1:14-cv-00621-SMS, 2015 WL 3448093, at *1 n.4 (E.D. Cal. May 28, 2015).

In an appointment on January 10, 2020, Dr. Liang noted "[t]his is a very complex case, he has done TMS, and he has tried different meds [without] benefits," and started Plaintiff on Zoloft.[9]  (Id. at 441.)  On January 21, 2020, Plaintiff reported that his energy and motivation were still low, but claimed he was "willing to get better."  (Id. at 443.)  Plaintiff described improvement in his mental health during an appointment on February 17, 2020, but reported that his "depression was coming" back at the following appointment on March 20, 2020.  (See id. at 447–49.)

On May 22, 2020, Plaintiff noted in his last session with Dr. Liang, "I know I have tried TMS, but it only lasts very short," and acknowledged he still suffered from depression and anxiety.  (Id. at 451.)  Dr. Liang prescribed Wellbutrin[10] for Plaintiff's mood and advised Plaintiff about the possibility of obtaining a Ketamine nasal spray[11] through the San Francisco Veterans Affairs Medical Center ("VAMC").  (Id.)

### 4.    Treatment through the San Francisco VAMC

In June of 2020, Plaintiff moved to the San Francisco Bay Area and began receiving treatment through the San Francisco VAMC.  (See id. at 1042.)  Dr. Jennifer Liu, a psychiatrist in San Bruno, California, diagnosed Plaintiff with treatment resistant bipolar II affective disorder and PTSD, and noted he had prior diagnoses of attention deficit hyperactivity disorder ("ADHD") and generalized anxiety disorder ("GAD").

---

[9] Zoloft is a brand name for Sertraline hydrochloride and is used to treat depression and anxiety.  See Motus v. Pfizer, 127 F. Supp. 2d 1085, 1088 (C.D. Cal. 2000); Boykin v. UNUM Life Ins. Co. of Am., No. 2:19-CV-00137-TLN-DB, 2022 WL 458213, at *4 n.12 (E.D. Cal. Feb. 15, 2022).

[10] Wellbutrin is an antidepressant used to treat Major Depressive Disorder.  Valenzuela v. Berryhill, Case No. 16-CV-2424 W (JMA), 2018 WL 1524496, at *3 (S.D. Cal. Mar. 28, 2018); Hughes v. Jansen, No. 2:11-cv-1856-KJM-EFB P, 2017 WL 1166157, at *1 (E.D. Cal. Mar. 28, 2017).

[11] "[Ketamine] was approved by the FDA in 2019 as a nasal spray for treatment-resistant depression in adults and depressive symptoms in adults with major depressive disorder with acute suicidal ideation or behavior."  Monroe v. Kirby, Case No. 2:21-cv-00017-GW-PD, 2023 WL 3331057, at *2 n.4 (C.D. Cal. Apr. 11, 2023).

24cv108-LR

(See id. at 1044.)  At his hearing, Plaintiff testified that he met with Dr. Liu remotely twice a month but contacted her more frequently if needed.  (See id. at 40.)

In her initial consultation with Plaintiff in June of 2020, Dr. Liu established a plan to continue Plaintiff on Prazosin,[12] Lurasidone, and Valium;[13] to increase Nortriptyline;[14] to restart Nefazodone;[15] to continue LGBT dialectical behavioral therapy ("DBT");[16] and for Plaintiff to start exploring part time job opportunities.  (Id. at 1082.)  In a mental status exam on November 4, 2020, Plaintiff scored a twenty-four out of twenty-seven on a Patient Health Questionnaire Depression Scale, placing his score within the range for severe depression.  (See id. at 1008.)  Dr. Liu described Plaintiff as having "had multiple medication trials with little benefit."  (Id. at 859.)

On April 6, 2021, Dr. Liu performed a comprehensive suicide risk evaluation of Plaintiff and assessed him with high risk for suicide after Plaintiff reported he had a suicide plan in place.  (Id. at 742.)  On April 27, 2021, Plaintiff reported that he noticed

---

[12] Prazosin is a medication that treats nightmares and other sleep issues related to PTSD.  Faber v. Berryhill, No. 16CV2781 GPC(JMA), 2017 WL 6761936, at *2 (S.D. Cal. Dec. 29, 2017); Bryan v. Berryhill, No. 2:16-cv-02987 AC, 2018 WL 1335519, at *5 n.6 (E.D. Cal. Mar. 15, 2018).

[13] Valium is a brand name of diazepam and is used to treat anxiety.  See Stuart v. Astrue, Civil No. 10-2385-WQH (WVG), 2011 WL 5444074, at *10 n.46 (S.D. Cal. Aug. 3, 2011); McFarland v. Berryhill, Case No. EDCV 18-1646 SS, 2019 WL 1863653, at *8 n.9 (C.D. Cal. Apr. 25, 2019).

[14] Nortriptyline is an antidepressant, which is sometimes used to treat neuropathic pain.  Rockett v. Astrue, Civil No. 10-0163-DMS (WVG), 2011 WL 4353126, at *7 n.25 (S.D. Cal. Aug. 16, 2011); Swafford v. Tiggs-Brown, Case No. 2:17-cv-07568-JFW-KES, 2018 WL 7395164, at *2 n.4 (C.D. Cal. Oct. 22, 2018).

[15] Nefazodone is an antidepressant.  See Perry v. Astrue, Civil No. 07cv276 L(JMA), 2009 WL 435123, at *3 (S.D. Cal. Feb. 19, 2009); Norwood v. Astrue, No. CV 07-06946-MLG, 2008 WL 4381614, at *2 (C.D. Cal. Sept. 24, 2008).

[16] "DBT is a type of cognitive behavioral therapy that aims to help patients identify and change negative behavior and thinking patterns."  Harris v. Mayeri, Case No. 20-cv-072330-SI (pr), 2022 WL 799427, at *6 (N.D. Cal. Mar. 16, 2022); see also Furtado v. Colvin, Case No. 13-cv-04063-HRL, 2015 WL 5728368, at *1 (Sept. 30, 2015) (describing DBT as "a treatment that helps patients to alter undesirable behavior").

improvements in his depressive symptoms with the increased Nortriptyline dosage.  (Id. at 1132.)  On May 25, 2021, Plaintiff expressed that, despite the improvements in his mood, his anxiety was not improving.  (See id. at 1108–09.)  In response, Dr. Liu further increased Plaintiff's dosage of Nortriptyline.  (Id. at 1109.)

Plaintiff participated in a LGBTQ DBT Skills Group beginning in March 2021.  (Id. at 733–34, 1087.)  Following the completion of fourteen DBT sessions in June 2021, Plaintiff "expressed a high degree of confidence in his ability to continue to effectively use skills [learned in DBT] to address his mood symptoms."  (Id. at 1088.)  Plaintiff did not express mood concerns or suicidal ideation at termination of DBT.  (See id.)

On June 23, 2021, Plaintiff reported "[my depression is] a lot better. . . I'm hoping my concentration and memory gets better."  (Id. at 1082.)  On July 26, 2021, Dr. Liu noted that, when Plaintiff's suicidal ideations were present, they were "existential" and without intent.  (Id. at 1174.)  Dr. Liu wrote that Plaintiff did not experience "urges to take his life or harm himself."  (Id.)  Dr. Liu also noted Plaintiff had no response to fourteen medication trials and only a partial response to Nortriptyline.  (Id. at 1182.)  On August 24, 2021, Plaintiff told Dr. Liu he was doing "okay" and had "been able to get out of bed, get work done," but that when he "g[o]t bored, he g[o]t suicidal."  (Id. at 1154.)  In his treatment notes from this session, Dr. Liu opined that Plaintiff's "acute risk [for suicide was] currently low despite chronic passive [suicidal intention]," referencing Plaintiff's contemporary behaviors and support system, but stated that Plaintiff was still at an "elevated chronic risk" due to his medical history.  (Id. at 1156.)

**5.    Subsequent outpatient treatment in San Diego**

Plaintiff reported to the San Diego Healthcare System ("HCS") for further treatment following his return to San Diego.  (See id. at 1433.)  In Plaintiff's initial consultation with Suzanne Watson, M.D., a psychiatrist, on May 4, 2022, he denied acute suicidal ideation since December 2020, and claimed his mood had stabilized since starting Nortriptyline.  (Id.)  Plaintiff reported his PTSD diagnosis but denied current symptoms.  (Id. at 1434.)  Plaintiff stated that he had experienced a panic attack the week

prior and had "no desire to die" but experienced fleeting suicidal ideation.  (Id.)  Dr. Watson noted that Plaintiff "[w]as treated [for ADHD] in the past, not currently a problem as he is no longer in school.  Can focus at work."  (Id.)  Plaintiff further asserted that he was now able to work and "do what [he] need[ed] to do."  (Id. at 1433.)

**B.    Plaintiff's Testimony and Statements, and Third-Party Report**

    **1.    Plaintiff's testimony during administrative hearing**

During the administrative hearing, Plaintiff testified he lived with five adult members of his family.  (Id. at 33–34.)  Plaintiff stated that it was necessary for him to live with someone else for emotional support and assistance.  (See id. at 39–40.)

Plaintiff further testified that he suffered from "bipolar II depression" and anxiety, including anxiety attacks.  (Id. at 33.)  Plaintiff described his anxiety attacks as "[d]ifficulty breathing, thoughts racing, unable to focus on the task at hand, I need . . . medical intervention as [in] taking medication to help calm [myself] down."  (Id.) Plaintiff also confirmed taking the following medications: Nortriptyline, Lurasidone, Prazosin, Diazepam, and Melatonin[17] to "help [him] sleep for PTSD conditions."  (Id. at 39.)

Additionally, Plaintiff reported that, at the time of the hearing, he worked part-time as a recruiting coordinator for Gary D. Nelson Associates, working about fifteen hours per week.  (See id. at 29.)  Plaintiff claimed that, if his employer offered him forty-hour-a-week employment in his current position under the current accommodation of remote work, Plaintiff would be able to accept that employment.  (See id. at 29–31.)

Plaintiff testified he was unable to perform in-person work because he regularly suffered anxiety attacks "in places of social pressure," including "workplaces or even just socializing events."  (Id. at 31.)  Plaintiff also testified that his anxiety attacks and

---

[17] "Melatonin is a neurohormone that regulates sleep."  Murphy v. Olly Pub. Benefit Corp., 651 F. Supp. 3d 1111, 1117 (N.D. Cal. 2023); see also Lopez v. Zarbee's, Inc., Case No. 22-cv-04465-CRB, 2023 WL 210878, at *1 (N.D. Cal. Jan. 17, 2023).

depression impeded his ability to maintain employment outside of his home.  (See id. at 31–32.)  Prior to his current employment, Plaintiff reported working as a financial analyst for the "Regents of the University of California, San Diego."  (See id. at 32.)  Plaintiff "only reported to that job for two days before [he] was unable to continue."  (Id.)

Plaintiff further reported he could not be on a computer for more than one-and-a-half hours before he had to move around due to difficulty focusing.  (Id. at 35.)  Additionally, Plaintiff could walk for approximately fifteen minutes before he had to stop due to fatigue.  (Id. at 36.)

## 2.    Plaintiff's disability report and questionnaire

On January 4, 2021, Plaintiff filled out a Function Report.  (See id. at 287–94.)  Plaintiff described how his illnesses limited his ability to work as follows:

> Anxiety that cripples making me unable to think or even be in a slightly stressful environments.  Depression takes away all energy or motivation to even get out of bed; always tired and anti-social.  Emotionally fragile, mood swings, irritable.  Constant lack of willingness to live.  Self-harm.  Very forgetful and cannot recall or follow simple instructions.  Hard to do calculations.  Drained and exhausted enough to sleep all day.  Scared, anxious, and overthinks social situations.  PTSD from military and authority figures.

(Id. at 287.)  Plaintiff self-reported that he suffered anxiety attacks, had to live with someone else for emotional support, could not cook for himself, had a short attention span, and could not drive sometimes due to suicidal thoughts.  (See id. at 289–290, 294.)

## 3.    Third-party report from Plaintiff's partner

On January 4, 2021, Plaintiff's partner Mike Liu filled out a Function Report for Plaintiff.  (Id. at 279–86.)  Liu stated that Plaintiff would go outside once a week and needed reminders to bathe and eat.  (Id. at 281–82.)  Regarding Plaintiff's illness, Liu wrote he "[m]et [Plaintiff] when he was outgoing, friendly, hospitable, lively, but things went downhill from there."  (Id. at 286.)

/ / /

/ / /

24cv108-LR

**C.    Dr. Liu's Medical Opinion**

On April 8, 2021, Dr. Liu completed a mental RFC assessment, detailing Plaintiff's symptoms and limitations.  (See id. at 716–22.)  Per the instructions of the form, Dr. Liu assessed Plaintiff's abilities to sustain different mental activities on a scale denoting the following options: none, mild, moderate, and marked.  (See id.)

Dr. Liu wrote that Plaintiff experienced several "marked" limitations, including: (1) maintaining attention, (2) performing activities within a schedule, (3) completing a normal workday and work week, and (4) working in proximity/coordination with others. (See id. at 718–719.)  Dr. Liu also noted that Plaintiff experienced several "moderate" limitations, including: (1) the ability to set realistic goals or make plans independently of others, and (2) the ability to tolerate normal levels of stress.  (See id. at 720.)

Dr. Liu further checked boxes indicating that Plaintiff would be absent, on average, more than four days a month from work due to his impairments, and that those impairments in combination would likely produce "good" days and "bad" days.  (Id.)  Dr. Liu did not select an answer for Question 10 on the form, which asked: "Is you[r] patient a malingerer?"  (See id. at 718.)  Dr. Liu wrote that "[Plaintiff's] residual or treatment refractory symptoms have caused him to be . . . more unable to work than able to work." (Id. at 721.)

## VI.    DISCUSSION

**A.    The ALJ Properly Considered Dr. Liu's Opinion**

**1.    Parties' arguments**

Plaintiff asserts that the ALJ improperly discounted Dr. Liu's opinion based on a reading of improvement that was not supported by the record.  (See J. Mot. at 4–7.) Plaintiff argues that the ALJ improperly relied on a reading of improvement in the medical records during the period of April to August of 2021 to discount Dr. Liu's opinion.  (See id. at 6.)  While Plaintiff concedes that "the record documents improvement" during this period, he asserts that it does not "quantify the degree of improvement or functionality of that improvement."  (Id.)  Plaintiff maintains that this

constitutes a defect which prevents the ALJ from discounting Dr. Liu's opinion based on a reading of improvement. (See id.) Plaintiff further asserts that the ALJ failed to consider the application of Dr. Liu's opinion prior to April 2021, and that this constitutes reversible error. (See id. at 6–7.) Plaintiff also contends that the ALJ erred in considering Dr. Liu's nonresponse to the question of whether Plaintiff was a malingerer. (See id. at 5.)

Defendant asserts that the ALJ properly discounted Dr. Liu's opinion based on substantial evidence in the record. (Id. at 7.) Defendant argues that the ALJ accurately evaluated Dr. Liu's medical opinion using the supportability and consistency factors to find Dr. Liu's opinion unpersuasive. (See id. at 7–8.) Defendant claims the ALJ properly explained that Dr. Liu's opinion conflicts with her own notes, as well as subsequent treatment records. (Id. at 8.) Defendant further asserts that the ALJ's discounting of Dr. Liu's opinion was a rational interpretation of the evidence, and thus, it is entitled to the court's deference. (Id. at 9 (citing Batson v. Comm'r of Soc. Sec. Admin., 359 F.3d 1190, 1993 (9th Cir. 2004).)

### 2.    Applicable law

In evaluating the intensity and persistence of a claimant's symptoms, an ALJ must consider all the available evidence from the claimant's "medical sources and nonmedical sources about how [the claimant's] symptoms affect [him or her]." 20 C.F.R. § 404.1529(c)(1). Medical opinions are more persuasive if they are supported by explanations and objective medical evidence, 20 C.F.R. § 404.1520c(c)(1), and if they are consistent with the evidence from other medical and nonmedical sources, id. § 404.1520c(c)(2). Furthermore, the medical opinion of a specialist "about medical issues related to his or her area of specialty" is more persuasive than that of a non-specialist. Id. § 404.1520c(c)(4). The purpose, length, and extent of a medical source's treatment relationship with the claimant, the kinds and extent of examinations and testing performed, and the frequency of the claimant's visits, may also demonstrate a medical source's knowledge and understanding of the claimant's impairments. Id.

§ 404.1520c(c)(3)(i)–(v). In addition, a medical source's familiarity with other evidence in a claim may make the source's opinion more persuasive. Id. § 404.1520c(c)(5).

Revised regulations apply to an ALJ's analysis of medical opinion evidence for claims filed on or after March 17, 2017. See Revisions to Rules Regarding the Evaluation of Medical Evidence, 2017 WL 168819, 82 Fed. Reg. 5844-01, at 5867–68 (Jan. 18, 2017). The Ninth Circuit has recognized that these new regulations upend the longstanding treating physician rule. See Woods v. Kijakazi, 32 F.4th 785, 790–94 (9th Cir. 2022). Under these new rules, the ALJ is no longer required to "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s)." 20 C.F.R. § 404.1520c(a). The ALJ must instead consider all the medical opinions in the record and evaluate each medical opinion's persuasiveness using factors including supportability, consistency, relationship with the claimant, and specialization. Id. The two most important factors in determining a medical opinion's persuasiveness are the opinion's "supportability" and "consistency." 20 C.F.R. § 404.1520c(a). The ALJ *must* articulate "how [he or she] considered the supportability and consistency of factors for a medical source's medical opinions . . . in [his or her] decision." 20 C.F.R. § 404.1520c(b)(2).

Related to supportability, the "more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) . . ., the more persuasive the medical opinions . . . will be." 20 C.F.R. § 404.1520c(c). For consistency, the "more consistent a medical opinion(s) . . . is with the evidence from other medical sources in the claim, the more persuasive the medical opinion(s) . . . will be." 20 C.F.R. § 404.1520c(c)(2). The ALJ is not required to explain how he or she considered other factors, unless the ALJ finds that two or more medical opinions about the same issue are equally well-supported and consistent with the record, but not identical. See 20 C.F.R. § 404.1520c(b)(3).

An ALJ's decision, "including the decision to discredit any medical opinion, must be supported by substantial evidence" under the new regulations. Woods, 32 F.4th at

787; see also Kitchen v. Kijakazi, 82 F.4th 732, 739–40 (9th Cir. 2023) (explaining that an ALJ must provide an explanation supported by substantial evidence, which articulates how the ALJ considered both supportability and consistency).  ALJs must address how they considered the consistency and supportability factors in sufficient detail to allow a reviewing court to conduct a meaningful review of whether that reasoning is supported by substantial evidence.  See Titus L. S. v. Saul, Case No. 2:20-cv-04825-AFM, 2021 WL 275927, at *7 (C.D. Cal. Jan. 26, 2021) (citing Ford v. Saul, 950 F.3d 1141, 1154 (9th Cir. 2020)); see also Treichler v. Comm'r of Soc. Sec. Admin, 775 F.3d 1090, 1103 (9th Cir. 2014) ("Although the ALJ's analysis need not be extensive, the ALJ must provide some reasoning in order for us to meaningfully determine whether the ALJ's conclusions were supported by substantial evidence."); Bunnell v. Sullivan, 947 F.2d 341, 346 (9th Cir. 1991) (explaining that "a reviewing court should not be forced to speculate as to the grounds for an adjudicator's rejection" of certain evidence).  The Ninth Circuit has noted that ALJs should attempt to use these terms "with precision." Woods, 32 F.4th at 793 n.4.

Although the revised rules provide new terms that an ALJ must use in evaluating medical opinion evidence, the new rules do not replace all previous caselaw within the Ninth Circuit.  For example, ALJs still may not cherry-pick evidence in discounting a medical opinion.  See Ghanim v. Colvin, 763 F.3d 1154, 1162 (9th Cir. 2014); see also Holohan v. Massanari, 246 F.3d 1195, 1207 (9th Cir. 2001) (reversing an ALJ's selective reliance "on some entries in [the claimant's records while ignoring] the many others that indicated continued, serious impairment").  Nor, for instance, may the ALJ dismiss medical opinions without providing a detailed explanation for doing so:

> To say that medical opinions are not supported by sufficient objective findings or are contrary to the preponderant conclusions mandated by the objective findings does not achieve the level of specificity our prior cases have required, even when the objective factors are listed seriatim.  The ALJ must do more than offer his own conclusions.  He must set forth his own interpretation and explain why they, rather than the doctors', are correct.

1  Regennitter v. Comm'r of Soc. Sec. Admin., 166 F.3d 1294, 1299 (9th Cir. 1999)

2  (internal citation omitted).

3      ### 3.    Analysis

4      The ALJ discounted Dr. Liu's opinion based on a conflict between Dr. Liu's

5  medical opinion and evidence from her own treatment records showing improvement.

6  (See AR at 144.)  Plaintiff asserts that the ALJ committed error by discounting Dr. Liu's

7  opinion based on a finding of improvement in Plaintiff's condition because, although the

8  record shows improvement, it "does not quantify the degree of improvement or

9  functionality of that improvement."[18]  (Id. at 6.)  This argument overstates the ALJ's duty

10  when discounting a medical opinion.  Under the relevant standard, the ALJ's decision

11  must simply be supported by "substantial evidence."  Woods, 32 F.4th at 787.

12      In this case, the ALJ properly considered the supportability of Dr. Liu's opinion

13  before discounting it.  In an assessment performed on April 8, 2021, Dr. Liu noted that

14  Plaintiff had marked limitations in his ability to "maintain attention and concentration for

15  extended periods"; "perform activities within a schedule, maintain regular attendance,

16  and be punctual within customary tolerances"; and "complete a normal workday and

17  week.  (AR at 719.)  The ALJ identified this opinion as conflicting with Dr. Liu's

18  treatment notes written between April 20, 2021, and August 31, 2021, which "reveal

19  reports of improvement with medication and treatment."  (Id. at 144.)  These treatment

20

21  _____

22  [18] Plaintiff makes the additional claim that the ALJ improperly "leveraged [Dr. Liu's] non-answer" to the question of whether
Plaintiff was a malingerer "against affirmative evidence" showing Plaintiff was a consistent and reliable historian.  (J. Mot at
23  6.)  This claim lacks merit.  The ALJ did not make any specific finding that Plaintiff was a malingerer.  (See AR at 136–45.)
The only discussion of malingering the ALJ provided was a "note that Dr. Liu did not respond to the question of whether the
24  claimant was a malingerer."  (Id. at 143.)  The Ninth Circuit has recognized that such a note does not constitute a finding on
the issue of malingering.  See Garrison v. Colvin, 759 F.3d 995, 1008 n.8 (9th Cir. 2014) ("Without concluding that
25  [claimant] was a malingerer, the ALJ noted a single inconsistency in [claimant's] testimony: whereas claimant claimed to
have gained one hundred pounds while on medication, the medical records showed that [claimant] had gained only
26  approximately twenty pounds.").  Moreover, the body of the ALJ's decision suggests that the ALJ did not believe Plaintiff
was a malingerer.  Rather, the ALJ determined that Plaintiff's "statements concerning the intensity, persistence and limiting
27  effects of [Plaintiff's] symptoms are not entirely consistent with the medical evidence and other evidence."  (Id. at 136.)  The
ALJ then provided detailed explanations for discounting Plaintiff's testimony.  (Id. at 137–45.)  Because the ALJ did not
28  weigh Dr. Liu's nonanswer in the manner Plaintiff asserts, Plaintiff is unable to show error arising from this note.

notes include a report from June 23, 2021, that Plaintiff was highly confident in his ability to use the skills from DBT treatment to address his symptoms.  (Id. at 1088.)  At that appointment, Dr. Liu reported Plaintiff had a "fine" mood, intact memory and concentration, and "grossly intact" cognition.  (Id. at 144, 1078–79.)  Dr. Liu's notes from this June 23, 2021 appointment also include Plaintiff's statement that "[his depression was] a lot better."  (Id. at 1082.)   On August 19, 2021, Dr. Liu noted that Plaintiff experienced "some benefit from his [N]ortriptyline in regard to his depression." (Id. at 144, 1156.)  At that same appointment, Dr. Liu recorded Plaintiff's statement that he was "able to get out of bed, get work done."  (Id. at 1154.)  These inconsistencies are sufficient to demonstrate a lack of supportability and are sufficient to discount Dr. Liu's opinion.  See Woods, 32 F.4th at 791–92 (quoting 20 C.F.R. § 404.1520c(c)(1)) (explaining that "[s]upportability means the extent to which a medical source supports the medical opinion by explaining the 'relevant . . . objective medical evidence.'").

The ALJ also considered the consistency factors when discounting Dr. Liu's opinion.  The ALJ noted that Plaintiff informed providers that "Seroquel helped him control his manic," "Pristiq helped his depression," "Xanax 'definitely' helped too because it helped his anxiety," and "Lithium helped stabilize his mood and decreased suicidal thoughts."  (AR at 141.)  Further, Plaintiff's other methods of treatment, including ECT and DBT, helped him learn to manage his symptoms and utilize coping skills.  (Id.)  The ALJ also noted that Plaintiff acknowledged his improvement, stating to providers that he "was doing okay," "better mentally," was able to "operate pretty well," and that there was a "huge improvement from a year ago."  (Id.)  Dr. Mark Berkowitz, a State medical consultant, evaluated Plaintiff on January 30, 2021, and found Plaintiff's severe mental impairments caused a mild limitation in understanding, interacting with others, concentrating, and maintaining oneself.  (Id. at 61–65, 144.)  Dr. Joshua Boyd affirmed these findings upon reconsideration on August 3, 2021.  (See id. at 98–102, 144).  Dr. Berkowitz and Dr. Boyd determined that Plaintiff was able to persist at tasks that could "be learned in 1 to 3 months on the job," work within proximity to others, and

interact briefly with the public.  (Id.)  By contrast, Dr. Liu found that Plaintiff "was more unable to work than able to work."  (Id.)  This conflict shows a lack of consistency and also provides a sufficient basis for the ALJ to discount Dr. Liu's opinion.  See Woods, 32 F.4th at 7992 (quoting 20 C.F.R. § 404.1520c(c)(2)) (explaining that "[c]onsistency means the extent to which a medical opinion is "consistent . . . with the evidence from other medical sources and nonmedical sources in the claim.").

Plaintiff makes the additional claim that the ALJ erred by not considering the application of Dr. Liu's opinion to the period where the ALJ found improvement.  (J. Mot. at 6–7.)  Plaintiff does not provide evidence to support this contention.  While Plaintiff correctly observes that the ALJ must adequately address variation in a claimant's symptoms over time, Plaintiff provides no evidence that the ALJ failed to do so here. (See id. (citing Smith v. Kijakazi, 14 F.4th 1108, 1112–13 (9th Cir. 2021)).  The ALJ discounted Dr. Liu's report based on inconsistencies with her own treatment notes from the relevant period, as well as subsequent records from other medical sources.  (See AR at 143–44.)  In the absence of evidence that the ALJ incorrectly limited Dr. Liu's findings to a specific period of time where Plaintiff was improving, the Court is unable to find that the ALJ committed legal error on this basis.

### 4.    Conclusion

The ALJ properly determined that Dr. Liu's medical opinion was unpersuasive because it was inconsistent with both her own treatment records and Plaintiff's subsequent treatment records from other providers.  The ALJ provided substantial evidence from the medical records that support this determination.  The Court therefore finds that the ALJ did not commit legal error in discounting Dr. Liu's opinion.

## B.    The ALJ Properly Relied on the 2017 Revision to the Relevant Regulation

### 1.    Parties' arguments

In the Reply section of the Joint Motion, Plaintiff asserts additional claims related to the Supreme Court's recent decision in Loper Bright Enters. v. Raimondo, which was published during the drafting of the Joint Motion for judicial review.  (J. Mot. at 10

(citing Loper Bright Enters. v. Raimondo, 603 U.S. 369, 373 (2024).)  Plaintiff first makes claims concerning to the ALJ's reconciliation of differences between the definition of a "moderate" limitation used by the VA and the definition of the same term used by the Social Security Administration.  (J. Mot. at 11.)  Plaintiff then asserts that the Supreme Court's decision in Loper Bright invalidates the 2017 Revisions to Rules Regarding the Evaluation of Medical Evidence because "an agency cannot promulgate regulations with notice and comment and then modify or change the definitions of terms in sub-regulatory promulgations."  (Id. at 10.)  Plaintiff argues that the ALJ improperly evaluated the evidence under the revised regulations rather than applying the previously-applicable treating physician rule.  (Id. at 12.)  Plaintiff states that "Congress did not authorize the Social Security Administration to jettison the treating physician rule," and argues that this Court should use the authority granted in Loper Bright to correct the administration's alleged error in doing so.  (Id. at 12–13)

Defendant asserts that Plaintiff's argument fails to implicate Loper Bright because it does not touch on questions of statutory interpretation.  (Id. at 13.)  Defendant argues that the Ninth Circuit has already recognized that the Social Security Act does not require a treating physician rule.  (Id.)  Further, Defendant asserts that the Ninth Circuit has recognized that the decision in Loper Bright does not undercut the Commissioner's ability to regulate the way the agency evaluates medical evidence.  (Id. at 14.)

### 2.    Applicable law

"[A]rguments not raised by a party in its opening brief are deemed waived."  Smith v. Marsh, 194 F.3d 1045, 1052 (9th Cir. 1999).  Further, "[c]laims not made in an opening brief in a sufficient manner to put the opposing party on notice are deemed waived."  Tri-Valley CAREs v. U.S. Dep't of Energy, 671 F.3d 1113, 1130 (9th Cir. 2012) (citing Swierkiewicz v. Sorema, N.A., 534 U.S. 506, 512 (2002)); see also Cedano-Viera v. Ashcroft, 324 F.3d 1062, 1066 n.5 (9th Cir. 2003) ("declin[ing] to consider new issues raised for the first time in a reply brief").  The Court may exercise its discretion to consider arguments raised for the first time in a reply brief if the opposing party "has not

been misled and the issue has been fully explored." <u>Merrick v. Paul Revere Life Ins. Co.</u>, 500 F.3d 1007, 1013 (9th Cir. 2007); <u>see also</u> <u>Nguyen v. Comm'r of Soc. Sec. Admin.</u>, 489 F. App'x 209, 209 (9th Cir. 2012) (applying this principle to the social security context).

The judiciary can review and reject interpretations of statutes adopted by federal administrative agencies. <u>Loper Bright</u>, 603 U.S. 369, 412–13 (overruling <u>Chevron U.S.A. v. NRDC</u>, 467 U.S. 837 (1984)). The Ninth Circuit has recognized that the Social Security Act does not require the ALJ to follow a treating physician rule in making his assessment. <u>See</u> <u>Woods</u>, 32 F.4th at 790; <u>see also</u> <u>Cross v. O'Malley</u>, 89 F.4th 1211, 1215 (9th Cir. 2024) ("[T]he statute does not restrict the Commissioner's authority to regulate the manner in which medical-evidence factors should be analyzed and discussed"). The Ninth Circuit has emphasized that its previous opinions upholding the validity of the 2017 Revisions to Rules Regarding the Evaluation of Medical Evidence should not be undercut by the end of <u>Chevron</u> deference. <u>Williams v. O'Malley</u>, No. 23-35358, 2024 WL 3519774, at *1 n.1 (9th Cir. 2024) ("<u>Loper</u> does not undercut <u>Cross</u>").

### 3. Analysis

Plaintiff states that he is "acutely aware" that this Court's order "precludes raising issues that [Defendant] did not have the opportunity to address." (J. Mot. at 10 n.2.) Nonetheless, Plaintiff asserts that doing so was proper because Defendant "had the opportunity to address" <u>Loper Bright</u> "nine days after" the opinion's publication. (<u>Id.</u>) Contrary to Plaintiff's assertions, the mere existence of a court's decision is insufficient to put an opposing party on notice of a party's claim involving that decision. <u>See</u> <u>Tri-Valley CAREs</u>, 671 F.3d at 1130 (citing <u>Swierkiewicz</u>, 534 U.S. 506, 512) (elaborating that the relevant standard is to "put parties on sufficient notice of underlying arguments, or arguments are deemed waived."). Plaintiff's arguments regarding the ALJ's reconciliation of different definitions of the term "moderate" are improperly before the Court, and the Court declines to exercise its discretion to address them. <u>See</u> <u>id.</u>

However, the Court will address the issue of the validity of the revised 2017 regulation change, including the elimination of the treating physician rule. The Court's exercise of its discretion to do so is proper, both because Defendant has had the opportunity to address this issue in a sur-reply, and because this issue involves a change in the law while Plaintiff's appeal was pending. See Nguyen, 489 F. App'x at 209 (emphasizing that such an exercise of discretion may be proper either where the opposing party has had the opportunity to respond fully or where "a new issue arises while appeal is pending because of a change in the law."). Ninth Circuit caselaw explicitly addresses the validity of the revised 2017 regulations, upholding them because they "fill a gap explicitly left by Congress and are not manifestly contrary to the statute." Cross, 89 F.4th at 1216 (internal quotation marks omitted) (quoting Chevron, 467 U.S. at 843–44).

Although Plaintiff argues that this caselaw is invalid because it relies, in part, on Chevron, (see J. Mot. at 12), Plaintiff's argument lacks merit. The Supreme Court has made clear that the opinion in Loper Bright, "do[es] not call into question prior cases that relied on the Chevron framework." Loper Bright, 603 U.S. at 412. Furthermore, the Ninth Circuit has also expressed that Cross remains valid, even taking into account the Supreme Court's opinion in Loper Bright. See Williams, 2024 WL 3519774, at *1 n.1 ("Loper does not undercut Cross").

### 4. Conclusion

For the reasons stated above, the Court finds that Plaintiff's argument is without merit. The ALJ therefore did not commit error by evaluating the evidence under the 2017 regulations.

## C.  The ALJ Presented a Complete Medical-Vocational Profile to the Vocational Expert

At the administrative hearing, the ALJ asked the VE to:

consider an individual who has no exertional, postural, or manipulative limitations, capable of persisting in job duties that require one to three months on-the-job training. . . . [O]nly occasional interaction with the

public, and the individual can work in proximity to others, but there's no indication that the individual can work in teamwork with others.

(AR at 47.)  The ALJ subsequently asked the VE whether there were any "employments in the national economy for such an individual?"  (Id.)  The VE responded in the affirmative, explaining that an individual meeting the description above could perform the jobs of "industrial cleaner, DOT code 381.687-018,"[19] "kitchen helper, DOT code 318.687-010,"[20] and "housekeeping cleaner, DOT code 323.687-014."[21]  (Id. at 47–48.) Based on the VE's testimony, the ALJ determined that Plaintiff was "capable of making a successful adjustment to other work that exists in significant numbers in the national economy" and was therefore not disabled.  (Id. at 146.)

## 1.    Parties' Arguments

Plaintiff asserts that the ALJ erred in describing Plaintiff's limitations to the VE. (See J. Mot. at 15.)  Specifically, Plaintiff claims that the ALJ's statement that "there's no indication that the individual can work in teamwork with others" was an impermissibly ambiguous expression of the limitation that Plaintiff cannot work in teamwork with others because it was not an "express limitation."  (Id.)  Plaintiff alleges that this ambiguity prevents the ALJ from relying on the VE's testimony as the basis for his final decision.  (Id. (citing Embrey v. Bowen, 849 F.2d 418, 422 (9th Cir. 1988)).)  Plaintiff asserts that the jobs the VE testified about were not reflective of Plaintiff's RFC because

---

[19] The VE estimated that there were approximately 20,000 jobs available in the national economy fitting this classification.  (See AR at 47.)

[20] The VE estimated that there were approximately 148,000 jobs available in the national economy fitting this classification.  (See id. at 48.)

[21] The VE estimated that there were approximately 220,000 jobs available in the national economy fitting this classification, but that only 110,000 of these would be available to an individual with the limitations the ALJ described because "some of these jobs do require very brief, insignificant interaction with the public."  (Id. at 48.)

they are listed as "unskilled work," which requires "working in coordination with others" as one of its critical functions.  (J. Mot. at 17.)

Defendant claims that the ALJ's expression of Plaintiff's RFC to the VE was sufficiently clear to allow for reliance on the VE's testimony.  (Id. at 16.)  Defendant argues that Plaintiff's claim is undercut by the VE's understanding of the question and testimony regarding what jobs a hypothetical individual with Plaintiff's RFC could perform.  (Id. at 16–17.)

### 2.    Applicable Law

At step five of the sequential evaluation process, the ALJ must determine whether the claimant can perform substantial gainful work in the national economy.  See 20 C.F.R. § 404.1520(f)–(g); Moore v. Apfel, 216 F.3d 864, 869 (9th Cir. 2000).  "[T]he ALJ may rely on an impartial vocational expert to provide testimony about the jobs the applicant can perform despite his or her limitations."  Gutierrez v. Colvin, 844 F.3d 804, 806–07 (citing Hill v. Astrue, 698 F.3d 1153, 1161 (9th Cir. 2012)).  If relying on a VE's testimony, ALJ must ask the VE "a hypothetical question based on medical assumptions supported by substantial evidence in the record and reflecting all the claimant's limitations, both physical and mental, supported by the record."  Hill, 698 F.3d at 1161 (citing Valentine v. Comm'r of Soc. Sec. Admin., 574 F.3d 685, 690 (9th Cir. 2009)).  If an ALJ fails to include all of a claimant's limitations in this hypothetical, the VE's subsequent testimony has "no evidentiary value to support a finding that the claimant can perform jobs in the national economy."  Hill, 698 F.3d at 1162 (quoting Matthews v. Shalala, 10 F.3d 678, 681 (9th Cir. 1993).  The reviewing court may still affirm the ALJ's decision "if the ALJ's failure to include all of the claimant's limitations was harmless."  Leach v. Kijakazi, 70 F.4th 1251, 1255 (9th Cir. 2023).  Harmless error "exists when it is clear from the record that the ALJ's error was inconsequential to the ultimate nondisability determination."  Tommasetti v. Astrue, 533 F.3d 1035, 1038 (9th Cir. 2008) (internal quotation marks omitted).

/ / /

### 3. Analysis

Plaintiff correctly asserts that the ALJ must pose a hypothetical to the VE that is "accurate, detailed, and supported by the medical record." <u>Tackett v. Apfel</u>, 180 F.3d 1094, 1101 (9th Cir. 1999). This hypothetical must include "all of a [claimant's] impairments" to form the basis for an ALJ's opinion. <u>Hill</u>, 698 F.3d at 1162. However, Plaintiff's claim that an instruction which is "arguably ambiguous" is categorically inaccurate and thus lacks evidentiary value is incorrect. (J. Mot. at 15.) Where the ALJ does not expressly include a claimant's limitations in the hypothetical posed to the VE, "the relevant inquiry . . . is whether the ALJ's question to the vocational expert concerning a hypothetical sufficiently convey[s] all of [the claimant's] limitations." <u>Terry v. Saul</u>, 998 F.3d 1010, 1014 (9th Cir. 2021). "[I]f the question does not expressly describe a particular limitation, [the reviewing court] . . . ask[s] whether the expert would have understood the question to imply that limitation." <u>Conway v. O'Malley</u>, 96 F.4th 1275, 1279 (9th Cir. 2024) (citing <u>Terry, 998 F.3d at 1014).</u> The ALJ may rely on the VE's testimony, even where the VE must draw limited specific inferences based on the form of the question. <u>See</u> <u>Terry</u>, 998 F.3d at 1014 (holding that an ALJ's instruction was complete where the VE "would have understood the ALJ's question to imply" all the claimant's limitations).

Plaintiff concedes that, "[t]he narrative explanation [of the ALJ's question] is clear, no teamwork." (J. Mot. at 15.) Read in its full context, the ALJ's instruction only underscores the distinction between the ability to work in proximity to others, which the hypothetical individual retained, and the ability to work in teamwork with others, which the hypothetical individual did not retain. (<u>See</u> AR at 47.) The instruction to the VE will be upheld if the VE would have understood the question to imply all of the Plaintiff's limitations. <u>See</u> <u>Conway</u>, 96 F.4th at 1279. The ALJ's instruction clearly implies a limitation of "no teamwork," and thus the ALJ did not commit error.

Moreover, even if the ALJ had committed error, such error would be harmless. The VE testified that a hypothetical individual with the limitations the ALJ described

could perform the jobs of "housekeeping cleaner, DOT code 323.687-014," "kitchen helper, DOT code 318.687-010," and "industrial cleaner, DOT code 381.687-018." (AR at 47–48.) Courts within the Ninth Circuit have affirmed findings of nondisability based on the capacity of individuals who cannot engage in teamwork to perform these jobs. See Cranor v. Kijakazi, No. 21-35734, 2022 WL 14936052, at *3 (9th Cir. Oct. 26, 2022) (affirming where the ALJ found a claimant was unable to perform teamwork, but could work as a housekeeping cleaner); Thomas J.M. v. Comm'r of Soc. Sec. Admin., NO: 2:18-CV-0126-TOR, 2019 WL 1244708, at *3, *6 (E.D. Wash. Mar. 18, 2019) (affirming where the ALJ found that a claimant was unable to perform teamwork, but could work as a kitchen helper); Allread v. Berryhill, No. 2:15-cv-00261-MKD, 2017 WL 727286, at *3, *11 (E.D. Wash. Feb. 23, 2017) (affirming where the ALJ found a claimant unable to perform teamwork could work as an industrial cleaner). Put simply, these jobs do not require teamwork. Because the VE's testimony was consistent with an RFC containing Plaintiff's proposed express limitation of "no teamwork," any error the ALJ committed in communicating a limitation on teamwork to the VE would be harmless.

## 4.    Conclusion

For the reasons described above the Court finds that the ALJ did not commit harmful error warranting remand in instructing the VE.

## VII.    CONCLUSION

For the reasons set forth above, the Commissioner's decision is **AFFIRMED**. This Order concludes the litigation in this matter. The Clerk is directed to issue a judgment affirming the decision of the Commissioner and close this case.

**IT IS SO ORDERED.**

Dated:  March 20, 2025

Honorable Lupe Rodriguez, Jr.
United States Magistrate Judge

24cv108-LR